**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

DAVID J. DAVIS,

      **Plaintiff,**

v.                        **Civil Action No. 5:10CV72
(The Honorable Frederick P. Stamp)**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

      This is an action for judicial review of the final decision of the defendant, Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment, which have been referred

to the undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

      David J. Davis ("Plaintiff") filed an application for DIB on March 22, 2007, alleging

disability beginning August 28, 2005, due to right "hand injury with nerve and tendon damage,

hearing both ears with total deafness in left ear and hearing aid used for right ear due to limited

hearing abilities, restless legs, knee pain both legs, due to missing cartilege (sic) and arthritis, and

hypertension" (R. 89, 111, 116). Plaintiff's applications were denied at the initial and

reconsideration levels (R. 46, 47). Plaintiff requested a hearing, which Administrative Law Judge

Karl Alexander ("ALJ") held on November 13, 2008 (R. 21). Plaintiff, represented by Andrea

Pecora, a non-attorney representative, testified on his own behalf (R. 21, 25-42) (Plaintiff's brief at p. 2). Also testifying was Vocational Expert Larry Ostrowski ("VE") (R. 43-45). On January 26, 2009, the ALJ entered a decision finding Plaintiff was capable of a reduced range of light exertional work (R.11-20). Plaintiff timely filed a request for review to the Appeals Council (R. 5-7). On May 18, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4).

## II. FACTS

Plaintiff was born on July 28, 1958, was fifty years old at the time of the administrative hearing, had a high-school education and had past relevant work as a delivery man (R. 25, 89, 117).

Dr. Currence treated Plaintiff for low back pain, restless legs, and heel pain from July 20, 2000, through January 7, 2003. He prescribed Celebrex (R. 654-59).

On August 29, 2005, Plaintiff was admitted to the Robert Wood Johnson University Hospital, in New Brunswick, New Jersey, for treatment of a severe right-hand injury that he sustained in a motor vehicle accident. Plaintiff's injury was an open wound of his right hand, "with multiple open fractures of metacarpals[1] to index middle ring and small fingers" and "[m]ultiple flexor and extensor tendon lacerations to same." Plaintiff had decreased sensation in all digits due to nerve and artery lacerations. Dr. Henry C. Hsia performed an "open reduction internal fixation of the metacarpal bones and primary repair of the FDS and FDP tendons to the index, middle ring and small fingers, primary repair to the common digital arteries." "Primary repair of the common digital nerves

---

[1]Metacarpals: 2. a bone of the metacarpus. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1160.

Metacarpus: the part of the hand between the wrist and the fingers, its skeleton being five cylindric bones (metacarpals) extending from the carpus to the phalanges. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1160.

supplying the index, middle ring and small fingers" was performed. Plaintiff's carpal tunnel was incised and released. A "primary repair of the extensor tendon structures to the long index right and small fingers was performed" (R. 168). Plaintiff was discharged on September 2, 2005. He medicated with Percocet (R. 169).

On September 5, 2005, Plaintiff presented to the emergency department at Davis Memorial Hospital with complaints of elevated blood pressure and elevated pain in his right hand (R. 217). Plaintiff wore a splint on his right hand; he could "wiggle[] [his] fingers" (R. 218). Plaintiff was medicated with Demerol and Clonidine (R. 220).

A September 9, 2005, x-ray of Plaintiff's right hand revealed soft tissue swelling and the location of seven pins (R. 206).

Plaintiff began care with Larry V. Carson, M.D., Associate Professor at WVU Department of Neurosurgery and Plastic Surgery, on September 12, 2009. Dr. Carson examined Plaintiff's right hand and found no drainage or infection; Plaintiff's hand was swollen. Plaintiff's left-ear sutures were intact; he had no drainage. Plaintiff was prescribed Keflex, ibuprofen and Percocet (R. 202).

Plaintiff was examined by Dr. Carson on September 15, 2009. Dr. Carson changed Plaintiff's right-hand dressing and prescribed Percocet (R. 200).

On September 22, 2005, Plaintiff presented to the emergency room of Davis Memorial Hospital with complaints of "something poking thru sutures" on his right hand (R. 212). It appeared that "one rod [was] protruding to skin" (R. 214). Plaintiff reported pain if "anything touche[d]" a small knot on his right wrist; he reported swelling (R. 215). An x-ray was made of his right wrist. It showed "major fracture fragments in the numerous fracture sites in the metacarpals are in reasonably anatomic position and alignment, status post internal fixation" (R. 216, 670). His splint

was replaced and he was prescribed Keflex and Norvasc (R. 212).

Plaintiff's September 27, 2005, right-hand x-ray revealed "flexion at multiple interphalangeal[2] joints that obscures detail on the image"; fracture of proximal shaft of second and fourth metacarpal; comminuted fracture of proximal shaft and metaphysis[3] of the third metacarpal; fracture of the neck of the fifth metacarpal; and ossicle at the ulnar styloid and negative ulnar variance. Fracture lines were still visible in the second, third, fourth and fifth metacarpal (R. 205).

On September 27, 2005, Plaintiff was examined by Dr. Carson, who found decreased motion and movement of his right hand and decreased sensation of his fingers. The pins were removed. Plaintiff was prescribed Percocet and Dr. Carson recommended Plaintiff undergo therapy three times weekly for the next four to six weeks. (R. 198).

Plaintiff began occupational physical therapy at United Hospital Center on October 3, 2005 (R. 225-31). On October 5, 2005, the physical therapist noted Plaintiff was "experiencing severe functional deficits related to an injury to his right dominant hand." Plaintiff was "unable to incorporate his hand into tasks in any way greater than gross assist and only [did] so in light tasks." Plaintiff had "no functional use of his hand including pinch and grip" (R. 232). Plaintiff received occupational physical therapy two, three or four times weekly (R. 249-629).

On October 21, 2005, Plaintiff presented to Dr. Carson for follow up to his "partial amputation of his right hand." Plaintiff's physical therapist, who was present for the examination, noted Plaintiff "seemed to have significant improvement since he ha[d] been undergoing therapy."

---

[2]Interphalangeal: situated between two contiguous phalanges. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 964.

[3]Metaphysis: the wider part at the extremity of the shaft of a long bone, adjacent to the epiphyseal disk. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1161.

Dr. Carson noted Plaintiff was able to move his fingers "mildly"; had decreased sensory functions "mainly at that tip of his right finger"; had no drainage, erythema, swelling; and had decreased range of motion "with early capsular contractures of the right hand." Plaintiff was prescribed Oxycodone and instructed to continue with rehabilitation and physical therapy (R. 196).

On January 27, 2006, Plaintiff was examined by Dr. Carson. Plaintiff was "gaining active and passive" ranges of motion with hand therapy; his "opposition" was improving; his intrinsic muscles had increased flexibility. Plaintiff's incision and injury sites "appeared to be nicely healing." His "hand and finger edema" continued to improve with "active and passive flexion and extension." Plaintiff's peripheral radial and ulnar pulses were intact. Dr. Carson recommended Plaintiff continue with "occupational and hand therapy," wear a compression glove, and keep his hand elevated at night. Dr. Carson noted Plaintiff "may return . . . to work on a limited one-handed basis." Plaintiff was referred to Dr. Currence for pain medication and control (R. 194).

Plaintiff's January 27, 2006, x-ray of his right hand was compared to the September 27, 2005, x-ray and showed "negative ulnar variance at the wrist"; mild soft tissue swelling; "posttraumatic osteopenia"; "flexion at multiple interphalangeal joints that obscures detail on the image"; fracture of proximal shaft of second and fourth metacarpal; comminuted fracture[4] of proximal shaft and metaphysis of the third metacarpal; fracture of the neck of the fifth metacarpal; and ossicle at the ulnar styloid and negative ulnar variance. Fracture lines were still visible in the second, third, fourth and fifth metacarpal. Small osteophytes within some interphalangeal/metacarpophalangeal[5] joints,

_____

[4]Comminuted fracture: one in which the bone is splintered or crushed. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 753.

[5]Metacarpophalangeal: pertaining to the metacarpus and phalanges. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1160.

which were indicative of degenerative joint disease, were viewed. Bone erosions at the first metacarpophalangeal and interphalangeal joint and head of the index proximal phalanx and third metacarpal were viewed. Inflammatory arthritis "including rheumatoid arthritis or gout" was diagnosed (R. 204).

On March 1, 2006, the physical therapist observed that Plaintiff's ranges of motion in all digits had increased a minimum of twenty degrees; he could incorporate his right hand as "assist/gross stabilizer in light to mod[erate] tasks 100% of time"; Plaintiff incorporated lateral pinch in light tasks without cues seventy-five percent of the time; Plaintiff could oppose the tip of his right thumb to the middle finger (R 388). Also on March 1, 2006, a Jebsen-Taylor Hand Function Test[6] was administered by Physical Therapist K. Pogue. Plaintiff's writing with right hand was two minutes, five second and one minute with left. He could turn a page with his right hand in twenty-three seconds and nine seconds with his left. Plaintiff attempted to lift a small object (penny) with his right hand for two minutes, twelve seconds; he could not pick up the penny. Plaintiff could pick up the penny in eight seconds with his left hand. Plaintiff's simulated feeding was for thirty-three seconds with his right hand and seventeen with his left. Plaintiff stacked checkers in thirty seconds with his right hand and eight with his left. Plaintiff could lift a large, light object with his right hand in eight seconds and in four seconds with his left. He could lift a large, heavy object in twelve seconds with his right hand and in four seconds with his left (R. 386, 389). Plaintiff could fit a nine-hole peg in one minutes, twenty-three seconds with his right hand and in twenty-one seconds with his left. The Moberg Pickup test showed that, sighted, Plaintiff attempted to pick up a key and a

---

[6]Jebsen Hand Function Test: a test that was developed to provide a standardized and objective evaluation of several major aspects of hand function using simulated activities of daily living. *See* http://www.scireproject.com/outcome-measures/jebsen-hand-function-test.

dime for three minutes and twelve seconds with his right hand; he could not pick up either object. Unsighted, Plaintiff could not identify with his right hand any object presented. It was noted that Plaintiff continued to have pain in his wrist and hand and that "with last Dr's visit revealing that he has non-union of fracture in 2nd, 3rd and 4th digits" (R. 389).

Plaintiff presented to the emergency department of Davis Memorial Hospital on March 5, 2006, with right ear pain and drainage (R. 208).

The physical therapist noted on May 8, 2006, that Plaintiff continued "to present with difficulty incorporating his affected dominant hand into functional tasks secondary to pain, ROM and strength deficits" (R. 450). This observation was made from June through August, 2006 (R. 479, 481, 483, 485, 540, 541, 543, 545, 549, 551, 552, 553, 554, 555, 556, 557, 612, 614, 616, 619, 627, 628, 629).

On June 2, 2006, Dr. Warren Breidenbach examined Plaintiff, who complained of "pain in the wrist, pain over the base of the metacarpals and limited motion in the hand." Plaintiff could not "extend at the PIP joints." Dr. Breidenbach noted Plaintiff had "possible lunotriquetral ligament tear in the wrist, nonunions of the third and fourth metacarpals at the base with possible nonunion of the second." Dr. Breidenbach found "malrotation with malunion at the distal end of the metacarpal of the fifth." Dr. Breidenbach ordered a MRI and an "open reduction and internal fixation with bone graft to reconstruct the nonunions along with an osteotomy of the small finger (R. 638).

On July 14, 2006, Plaintiff presented to Dr. Breidenbach for a preoperative evaluation. He noted he was going to "fix, re-align, and put bone graft in" the "base of the 4th and 5th" nonunions

and "do an osteotomy and rotate the little finger." Plaintiff's MRI showed a "scapholunate[7] tear." Plaintiff had good range of motion of the right wrist and no ulnar impingement (R. 638).

On August 4, 2006, Plaintiff presented to Dr. Breidenbach for postoperative "S/P open reduction and internal fixation of the 3 metacarpal." Dr. Breidenbach noted the "x-rays look[ed] good." He planned to "work on range of motion of the digits while keeping the wrist immobilized." Dr. Breidenbach opined it would be three months to get "to the 2nd stage which is loosening the tendons." In that time, Dr. Breidenbach "need[ed] to get bones to heal" and for Plaintiff to "reach maximum range of motion of the digits." Plaintiff was placed on "one-handed duty" (R. 637).

On August 24, 2006, the physical therapist noted Plaintiff was "becoming discouraged with progress secondary to ongoing AROM deficits" (R. 559).

On August 30, 2006, the physical therapist noted Plaintiff "continued to make progress as evidenced by increased PROM and AROM of all digits" (R. 562).

On September 1, 2006, Dr. Breidenbach noted that Plaintiff's bone was slowly healing. Plaintiff was tender on palpation over the dorsum of his right hand. He "still ha[d] a delayed union." Plaintiff was instructed to continue using the "bone stimulator" and "slow down" on occupational therapy. Dr. Breidenbach noted Plaintiff's right hand motion was "doing well" (R. 637).

On January 12, 2007, Dr. Breidenbach found Plaintiff's metacarpals had healed. Plaintiff reported pain over the dorsum of his right hand. He had mild claw deformity "without hyperextension of the metacarpal joints." Dr. Breidenbach found the "intrinsics are basically out." Plaintiff had abduction of his right thumb. He had limited flexion "but extension [was] passively

---

[7]Scapholunate: pertaining to the scaphoid and lunate bones. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1698..

very good and actively somewhat good." Dr. Breidenbach opined that Plaintiff's "digital nerves or the median nerve was caught on the initial injury because the two-point discrimination [was] increased." Plaintiff had no "markedly positive Tinel's sign." He found "repeat surgery with reconstruction" would not be helpful (R. 637).

Also on January 12, 2007, Dr. Breidenbach completed a "Return-to-Work Capabilities" form for Plaintiff. He opined that "further surgery would [not] improve R hand." He found Plaintiff was permanently impaired and that he'd reached his maximum level of improvement. He instructed Plaintiff to discontinue occupational physical therapy. Dr. Breidenbach found Plaintiff could return to "light" work and that he could not climb (R. 630-31).

Plaintiff was discharged from occupational therapy on March 22, 2007. It was noted that his range of motion and strength was decreased (R. 607). It was determined that Plaintiff had reached his maximum level of function (R. 610).

On June 11, 2007, Dr. Kip Beard completed West Virginia Disability Internal Medicine Examination of Plaintiff. Plaintiff reported a "near traumatic amputation of his right hand," caused by a motor vehicle accident, injury to his left hip, injury to his lower back, and right ear laceration caused by a motor vehicle accident. Plaintiff stated he experienced "ongoing loss of range of motion" of his right hand, "numbness in the distal half of the palm[] and mainly the second through fifth fingers, but some in the thumb." Plaintiff reported right-hand weakness with "diminished manipulatory ability." Plaintiff stated he had "irritating pain on the dorsum of the hand, wrist, and thumb." Plaintiff reported he could not write with his right hand and "now writes with his left hand." Plaintiff reported "difficulty with buttons, zips, also shaving." Plaintiff reported bilateral knee pain (R. 639). Plaintiff stated he experienced arthritis symptoms in his elbows and fingers.

9

Plaintiff experienced lower back pain and reported he had been diagnosed with two herniated disks. Plaintiff had been treated with physical therapy and medication for his low back pain. Plaintiff reported he had hypertension (R. 640).

Plaintiff's gait was normal; he was able to stand unassisted; able to arise from a seated position; able to step up and down from the examination table. Plaintiff could speak and follow instructions. Plaintiff's blood pressure was 158/94. Dr. Beard's examination of Plaintiff's HEENT, neck, chest, cardiovascular, cervical spine and abdomen were normal. There was "some trace pretibial edema without stasis changes" in Plaintiff's extremities (R. 641-42). Plaintiff had pain in his right wrist and stiffness on range of motion, mild tenderness, flexion of forty degrees, and radial deviation of ten degrees. Plaintiff had "some flexion contracture at the first through fifth fingers with some visible tethering of the flexor tendon, especially at the third finger" of the right hand. Plaintiff's right hand was positive for intrinsic hand atrophy. Plaintiff could not make a fist with, fully extend the fingers of, or oppose the thumb of his right hand. Dr. Beard found Plaintiff's "[m]etacarpophalangeal range of motion for the second finger [was] 10 degrees of extension with 20 degrees of flexion"; third finger was fifteen degrees of extension and twenty-five degrees of flexion; fourth finger was twenty degrees of extension and twenty-five degrees of flexion; and fifth finger was twenty-five degrees of extension with thirty degrees of flexion. Plaintiff's proximal interphalangeal for his second through fifth fingers was sixty degrees of extension and ninety degrees of flexion (R. 642). Distal interphalangeal extension of Plaintiff's second finger was forty degrees, third finger was thirty degrees, fourth finger was thirty degrees, and fifth finger was twenty-five degrees (R. 642-43). There was minimal flexion ability of Plaintiff's second through fifth fingers at his distal interphalangeal. Dr. Beard noted Plaintiff had "moderate" difficulty in writing and picking

up a coin with his right hand. His right hand's grip strength was "10, 18, and 16 kg of force." Dr. Beard found "sensation loss about the mid palm of the right hand to the palmar aspect of the second through fifth fingers." Plaintiff had right wrist weakness and right hand atrophy (R. 643).

Plaintiff's knees were normal, except for "some patellae femoral crepitus with flexion of both." Except for some "mild pain on motion testing" of Plaintiff's lumbosacral spine, Dr. Beard's examination was normal. Plaintiff could heel, toe and tandem walk. Plaintiff could squat "halfway with some complaints of knee pain" (R. 643).

Dr. Beard noted that Plaintiff was prescribed and taking Lotrel (a high blood pressure medication), Hyzaar (a high blood pressure medication), ReQuip (medication for Parkinson's Disease, but prescribed to treat restless leg syndrome), Celebrex for treatment of osteoarthritis and rheumatoid arthritis), oxycodone (an opioid analgesic derived from morphine, used to treat pain), and Lexapro (an antidepressant).[8]

Dr. Beard's impression was for right hand crush injury, chronic lumbosacral strain, diminished hearing, hypertension and bilateral knee pain (R. 643-44). He found Plaintiff had a right-hand crush injury "with multiple fractures and reported near traumatic amputation, status post surgery two times." Plaintiff had "residual range of motion loss, atrophy, weakness," and manipulatory and sensation loss (R. 643). Dr. Beard found Plaintiff could not make a fist, extend his fingers, or oppose his thumb. Plaintiff had grip-strength loss in his right hand. Plaintiff had mild range of motion loss in his knees. Plaintiff had "some mild pain and tenderness" of his back without nerve root impingement. There was no end-organ damage noted as to Plaintiff's hypertension.

---

[8]All medications as found in DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (31st edition 2007).

Plaintiff was wearing a right hearing aid; he "seem[ed] to respond normally to normal conversational volume" during the examination (R. 644).

On June 22, 2007, Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 646). Dr. Franyutti found Plaintiff had occasional limitations in his ability to climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He found Plaintiff could never climb ladders, ropes or scaffolds (R. 647). Plaintiff was limited in his ability to reach in all directions, handle, finger, and feel. Dr. Franyutti noted Plaintiff's right-hand injury resulted in residual atrophy, weakness, and reduced manipulation and sensation. Plaintiff had no manipulative limitations to his left hand (R. 648). Plaintiff had no visual or communicative limitations (R. 648-49). Dr. Franyutti noted Plaintiff appeared to be credible and his allegations were supported by the findings (R. 650).

On June 26, 2007, Plaintiff reported to his treating physician Dr. Currence that he experienced chronic right hand pain, hypertension, and depression (R. 664). Dr. Currence diagnosed depression, hypertension and chronic pain and added a prescription for Lexapro (R. 665).[9]

On September 27, 2007, Dr. Atiya M. Lateef affirmed the June 22, 2007, findings of Dr. Franyutti (R. 653).

On February 7, 2008, Plaintiff reported to Dr. Currence that his depression had improved (R.

---

[9]Dr. Currence is Plaintiff's treating physician, with records of treatment dating back to 2000 (R. 656). Dr. Currence's diagnoses over those years include: restless leg syndrome since 2000; back pain since 2000; heel pain in 2000; obesity since 2000; osteoarthritis and joint pain in 2001.

667).  Dr. Currence diagnosed depression improved, obesity, chronic hand pain and hypertension.

<u>Administrative Hearing</u>

At the November 13, 2008, administrative hearing, Plaintiff testified he had driven a tractor-trailer and delivered dairy products for twenty-two years (R. 26-27).  He stated he had received worker's compensation benefits from August, 2005, until the spring or fall of 2007 (R. 27-28).

Plaintiff testified his back and his hand conditions caused him not to work (R. 28). Plaintiff stated he had one herniated disk twelve or thirteen years prior to the administrative hearing and one earlier than that.  Plaintiff did not work for three months due to each of the herniated disks (R. 29). Plaintiff testified he underwent surgery for his hand the night of the accident and then had a subsequent surgery one year later.  Plaintiff stated that, during the first surgery, his hand was reconnected and, during his second surgery, "three plates and 90 screws" were implanted to attempt to repair four bones that had not healed (R. 29-30).  Plaintiff testified he received occupational therapy until he had the second surgery (R. 30-31).  Plaintiff stated he had not received any recent treatment for his knees and back; the last treatment for his back was for his most recent herniated disk, which was twelve or thirteen years earlier (R. 35).

Plaintiff testified he'd gained thirty-five pounds since he stopped working, which was due to inactivity (R. 25).  Plaintiff stated he could not make a fist with his right hand; his thumb moved "a little bit."  Plaintiff testified he experienced constant pain in his right wrist.  He did not have feeling in his right hand (R. 32).  Plaintiff testified he was restless and had difficulty sleeping due to worry, restless leg syndrome and right-hand pain, which he described as "throbbing, stabbing, nerve-like" (R 33-34).  Plaintiff stated his hypertension was under "pretty good check" with medication (R. 34).  Plaintiff stated that his back and knees were "a little bit looser" because of the

medication he took for them. Plaintiff testified that standing on hard surfaces for a "very long" time caused his knees and back to hurt (R. 35).

Plaintiff testified he medicated with Oxycodone, five tablets per day (R. 33). Plaintiff testified he took medication for restless leg syndrome and hypertension (R. 34). Plaintiff took Celebrex for his knee and back symptoms (R. 34-35). Plaintiff was also provided a "chair back brace" to wear "from time to time" (R. 35-36).

Plaintiff testified he could not do anything with his right hand (R. 38). Plaintiff testified he could not tie his shoes or "wash . . . real good" because of his right hand limitations. Plaintiff stated he wrote like a first or second grader with his right hand (R. 32). Plaintiff testified he could no longer hunt or fish. He could not play video games. Plaintiff stated he "[p]retty much just [hung] around the house . . ." (R. 36). Plaintiff testified he could sometimes shave with his left hand. He could eat with his left hand but not cut his food. Plaintiff drove an automatic car (R. 37).

The ALJ asked the following hypothetical question to the VE:

. . . [A]ssume a hypothetical individual of the Claimant's age, educational background, and work history who would be able to perform a range of light work; could perform postural movements occasionally, except could not climb ladders, ropes, or scaffolds; would have essentially no functional use of the dominant right hand, except as a helper hand; should not be exposed to temperature extremes or hazards; and should work in a relatively low noise environment. Would there be any work in the regional or national economy that such a person could perform? (R. 42).

The VE responded:

Yes, Your Honor. And I'll define the local economy as 20 percent of all jobs in the state (sic) of West Virginia, based on . . . Bureau of Labor Statistics (sic). There would be the work of a cashier. In the local economy, there are 1,436 jobs; in the national economy, 999,201 jobs. There would be the work of a storage facility counter clerk. In the local economy, there's 69 jobs; in the national economy, 58,011 jobs. There would be the work of a marker. In the local economy, there are 217 jobs; in the national economy, 184,281 jobs (R. 42).

14

Plaintiff's non-lawyer representative asked the VE the following question:

Because of the limited use of the right hand, dominant hand, this person's pace slash (sic) production would be down at least a third. And as a result of this, this person would have a problem meeting the competitive demands of . . . the job. How . . . would that, in your opinion, affect their (sic) ability to sustain a job? (R. 43).

The VE responded as follows:

Yes, then it would ultimately result in the person losing the job.

The ALJ and the VE engaged in the following question/answer exchange:

ALJ:   Now, . . . what kind of hand action does the cashier job require? We're talking about just pushing number buttons . . . and taking . . . change out of the drawer? (R. 43).

VE:    Yes. . . .  And . . . this would be the cashier of a convenience store . . . as opposed to a cashier checker . . . at a supermarket . . . where they (sic) might handle some heavier stuff (R. 43).[10]

ALJ:   And the storage facility counter clerk, what . . . (R. 43).

VE:    Yeah, . . . that's a person who operates a storage facility, and has to deal with customers that come in, and perhaps arrange . . . (R. 44).

ALJ:   You mean one of those places where you store your own stuff? (R. 44).

VE:    Yes. . . . (R. 44).

ALJ:   Do they have to do very much writing? (R. 44).

VE:    A little bit (R. 44).

ALJ:   But not . . . a great deal? (R. 44).

VE:    It's like filling out a form or a lease or a contract (R. 44).

---

[10]Although the undersigned will not substitute his opinion for that of the Vocational Expert, from the evidence of the manual dexterity testing performed by Physical Therapist Pogue, it seems unlikely that Davis, using solely his non-dominant hand, with no additional training, could acceptably perform the job of cashier checker at a convenience store–lifting and bagging items, making change, etc. That being said, this decision does not rely on the vocational expert's testimony.

ALJ:   Blanks to fill in . . . ? (R. 44).

VE:    Yes (R. 44).

ALJ:   . . . . And how about the marker?  What . . . do they do? (R. 44).

VE:    Well, that's a person who goes throughout a store and changes pricing on products (R. 44).

ALJ:   They have one of them (sic) little gadget machines that prints out a sticker or something like that? (R 44).

VE:    It . . . can be.  Or it could be just . . . a hand thing . . . sticking it on the . . . shelf . . . below the product (R. 44-45).

## Submitted to Appeals Council

On March 16, 2009, Plaintiff wrote a letter to the Appeals Council requesting an appeal and stating that the lawyer he had had not provided all his medical records.  The lawyer had also not given him back the records he provided her so he was requesting additional time to file his appeal (R. 6).  He was granted additional time to submit the evidence.

On May 28, 2009, Plaintiff wrote to the Appeals Council, stating his representative, Andrea Pecora, "represents herself as being a lawyer and [he] just found out she isn't."  He had asked her office to return all his paperwork, but was informed they had shredded them.  Further, three days before his administrative hearing Ms. Pecora's office had called to say they had no records from his family doctor.

Plaintiff stated that his back and knees hurt all the time but since he had no insurance for the past four years he could not have the tests his doctor recommended.  He believed the herniated discs in his back were made worse by the accident.  Because he could not work

16

since the accident he had gained a lot of weight, and was "so depressed that I sit and cry most days from pain and frustration over all of this." He stated he had been very depressed since this accident and Dr. Currence started him on citalopram for depression but he did not think it was helping much. He needed "a lot of pain pills" and had no insurance to get further treatment or tests.

He provided the following additional records, which were accepted by the Appeals Council and included in the record:

On July 29, 2008, Plaintiff presented to Dr. Currence with complaints of chronic right wrist pain, difficulty sleeping, chronic back pain, hypertension, and restless leg syndrome (R. 680).

On March 29, 2009, Plaintiff presented to Dr. Currence for a follow up examination relative to his hypertension. He reported that he was doing well on his hypertension medication. He did complain of joint pain (R. 681).

On May 12, 2009, Plaintiff presented to Dr. Currence with headache in the back of his neck (R. 674). Dr. Currence diagnosed Plaintiff with headache most likely due to stress /anxiety. He prescribed Celexa (used to treat depression and anxiety) (R. 675).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Alexander made the following findings:

1. The claimant meets the nondisability requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the "period at issue" herein, i.e., since August 28, 2005 (R. 14).

2. The claimant has not engaged in "substantial gainful activity" at any time during the period at issue (20 CFR §§ 404.1520(b) and 404.1571 *et seq.*) (R. 14).

3. During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: residual effects including atrophy, weakness and fine manipulation, range of motion and sensory loss, status post crush injury to the dominant (right) hand; deafness in the left ear/decreased hearing in the right ear requiring use of a hearing aid; history of hypertension, controlled; and obesity (20 CFR § 404.1520(c)) (R. 14).

4. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525 and 404.1526) (R. 14).

5. Throughout the period at issue, the claimant has had at least the residual functional capacity to perform, within a low noise environment, a range of work activity that: requires no more than a "light" level of physical exertion; requires no climbing of ladders, ropes or scaffolds, or more than occasional performance of other postural movements (i.e., balancing, climbing ramps/stairs, crawling, crouching, kneeling and stooping); requires no significant or primary functionality of the dominant (right) hand, which may be used only as a "helper" hand; and entails no significant exposure to temperature extremes or to hazards (e.g., dangerous moving machinery, unprotected heights ) (20 CFR § 404.1520(e)) (R. 15).

6. Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of his "vocationally relevant" past work as a sales route/delivery driver (dairy products) (20 CFR § 404.1565) (R. 18).

7. The claimant during the period at issue is appropriately considered for decisional purposes initially as a "younger individual," and upon and after his attainment of age of 50 in July 2008, an "individual closely approaching advanced age" (20 CFR § 404.1563) (R. 18).

8. The claimant has attained a "high school" education and is able to communicate in English (20 CFR § 404.1564) (R. 19).

9. The claimant has a "skilled" or "semi-skilled" employment background as a delivery driver but acquired no particular work skills that are transferable to any job that has remained within his residual functional capacity to perform during the period at issue

(Social Security Ruling 82-41, and 20 CFR § 404.1568 and Part 404, Subpart P, Appendix 2) (R. 19).

10.     Considering the claimant's age, level of education, work experience and prescribed residual functional capacity, he has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the national economy (20 CFR §§ 404.1560(c) and 404.1566) (R. 19).

11.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since August 28, 2005 (20 CFR § 404.1520(g)) (R. 20).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.     The Commissioner's decision is not supported by substantial evidence because the VE's testimony, in total, shows that Plaintiff cannot perform substantial gainful activity.

2.     The ALJ failed to develop the record concerning Plaintiff's depression.

The Commissioner contends:

1.     Plaintiff failed to demonstrate that the ALJ was biased.

2.     The ALJ's credibility findings are supported by substantial evidence

3.     The ALJ properly relied on the VE's testimony in finding Plaintiff not disabled.

4.     The ALJ properly developed the record.

## C. Pain and Credibility

Plaintiff first argues that the Commissioner's decision is not supported by substantial evidence because the VE's testimony shows that Plaintiff cannot perform substantial gainful activity. Plaintiff first asserts that the ALJ's discussion of Plaintiff's workers' compensation case showed bias against him.  Second, that the ALJ's finding that he was not credible concerning his pain and limitations is not supported by substantial evidence.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

When analyzing claims of bias against an ALJ, the Court must start from the presumption that ALJ's are unbiased. See Schweiker v. McClure, 456 U.S. 188, S.Ct. 1665, 72 L.Ed.2d 1 (1982), and that they exercise their decision-making authority with honesty and integrity. See Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). These presumptions can only be rebutted by showing a conflict of interest existed or by showing some other specific reason for disqualification. See Schweiker, 456 U.S. at 195.

The ALJ did discuss Plaintiff's workers' compensation case during his credibility evaluation, stating:

> The Administrative Law Judge notes generally than an occupationally-injured individual's inability to return to and perform his customary duties and the unavailability of an alternative, limited or reduced duty job is generally sufficient to establish eligibility to receive workers' compensation. However, such factors do not necessarily indicate, equate with or establish that individual's impairment-related inability to perform any and all forms of work activity for a period of 12 consecutive months, i.e., a finding that preconditions any entitlement to Social Security disability benefits. Moreover, the undersigned believes that an individual's ongoing receipt of workers' compensation benefits presents an appreciable, if not substantial, disincentive with regard to seeking alternative, less demanding forms of gainful employment that might accommodate any legitimate impairment-related limitations. In fact, "abandoning" such an occupational injury claim or potential claim in order to seek or even accept other, less demanding forms of employment may clearly be against such an individual's best interests. Thus, the undersigned believes that various underlying interests that are implicated in conjunction with an individual's pursuit of an occupational injury claim presents an ongoing, secondary source of motivation that must be fully considered in evaluating those subjective complaints and statements made by that individual to medical practitioners and others which serve generally to facilitate such interests.
>
> Put simply, the undersigned believes that the claimant has throughout the period at issue remained capable of performing less demanding alternative types of work activity, including jobs of the nature that were identified by the impartial vocational expert at the November 2008 hearing. The Administrative Law Judge is unable to conclude that the claimant has for any 12 months during the period at issue been precluded from performing any and all forms of gainful work activity. He has previously demonstrated the ability to perform and sustain "substantial gainful

activity" despite his hearing deficiencies, hypertension, and alleged back and knee pain. As indicated hereinafter, the vocational expert identified jobs that the claimant could perform and could have performed even absent significant functionality of his dominant (right) hand. The claimant has relied for a significant period on oxycodone (i.e., a strong opiate pain medication) and has consistently denied any related side effects (Exhibits 2E/9, 8E/3, 11E/3, 12E/1, 4F/5 and 7F/2). The claimant indicates that he daily or regularly enjoys movies and television, plays computer games, completes puzzles, helps care for his pet dogs, cuts grass with a riding mower, with assistance in getting it started, empties a dishwasher, drives an automobile, and is able to do so alone, shops in stores and by computer, and eats out three to four times a week (Exhibit 4E/1-5). Thus, although the claimant is clearly limited with regard to use of his right hand, he retains significant functionality. The undersigned believes any residual pain symptoms that the claimant may have continued to experience are adequately relieved by medication - - at least to such an extent as would enable his ability to perform and sustain such a limited range of work activity as has been defined above.

(R. 16-17).

The undersigned agrees with Defendant and finds Plaintiff has failed to establish the ALJ was biased against him. The first two sentences of the first paragraph simply and accurately set forth the differing legal and factual standards for receiving workers' compensation versus Social Security disability benefits, explaining that, simply because a person is awarded workers' compensation benefits does not mean he is disabled from all work or entitled to Social Security benefits. The undersigned finds nothing objectionable in the ALJ's pointing out this difference between the two programs. Even the ALJ's stated "belief" that receipt of workers' compensation may be a disincentive to looking for other work, and motivation to continue pursuing the claim, as a generalization, is legally proper. As the ALJ himself states, abandoning the workers' compensation claim in order to seek other work may not be in the individual's best interest. His statement that subjective complaints made by individuals seeking or collecting workers' compensation benefits to medical practitioners should be evaluated keeping in mind secondary gain is also legally proper, as

"the ALJ is permitted to consider the entire record, including evidence of claimant's possible motivations for secondary gain." See Gaddis v Chater, 76 F.3d 893, 896 (8th Cir. 1996)(cited with approval by this Court in Sutphin v. Astrue, 2009 WL 103585 (N.D.W.Va. 2009)(slip copy)). The undersigned finds Plaintiff has failed to show a conflict of interest or some other specific reason for disqualification existed, and therefore failed to rebut the presumption that the ALJ was unbiased. See Schweiker, 456 U.S. at 195. While proper to consider, however, under the uncontradicted facts of this case, mentioning that Davis has a compensation claim adds absolutely nothing to the credibility analysis. There is not a scintilla of evidence that Davis failed to seek any kind of work post-injury because he feared the effect that would have on his pending compensation claim.

Regarding the ALJ's credibility analysis, the Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§

416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. Here the ALJ found Plaintiff met the first, threshold step in that he had medically determinable impairments that could reasonably be expected to produce some of the symptoms Plaintiff alleged. He was therefore required to go onto the second step, taking into account all the available evidence to evaluate the intensity and persistence of Plaintiff's pain and the extent to which it effects his ability to work.

The ALJ does discuss Plaintiff's right hand injury and the treatment Plaintiff undertook to alleviate it, including surgical repair in August 2005 and physical therapy. The ALJ omits that Plaintiff's surgical repair involved four days in the hospital. About three weeks later, Plaintiff returned to the ER with complaint that one rod was protruding to the skin and that he had pain if anything touched his right wrist. As the ALJ notes, x-rays indicated "major fracture fragments in the numerous fracture sites in the metacarpals are in reasonably anatomic position and alignment." (Emphasis added). The ALJ also discusses to some extent Plaintiff's physical therapy. Plaintiff began physical therapy on his hand in October 2005, attending two, three or four times weekly. By October 21, 2005, he seemed to have significant improvement through therapy. On January 27, 2006, x-rays showed fracture lines still visible and small osteophytes within some of the joints, which were indicative of degenerative joint disease. He was diagnosed with inflammatory arthritis, including rheumatoid arthritis or gout. By March 1, 2006, Plaintiff continued to have pain in his wrist and his doctor indicated he had non-union of the fracture in the 2nd, 3rd, and 4th digits. In May 2006, the physical therapist noted that Plaintiff continued to present with difficulty incorporating his

hand into functional tasks secondary to pain, range of motion and strength deficits.

In June 2006, Plaintiff continued to complain of pain. His doctor found "malrotation with malunion at the distal end of the metacarpal of the fifth." Plaintiff underwent a second surgical procedure, not mentioned by the ALJ, in July 2006, in which the doctor was to "fix, re-align, and put bone graft in" the base of the 4th and 5th nonunions and do an osteotomy and rotate the little finger. MRI showed a scapholunate tear. He underwent an open reduction and internal fixation of the third metacarpal.

In August 2006, after undergoing ten months of physical therapy and a second surgery, Plaintiff still had pain, range of motion deficits and strength deficits. Plaintiff was reportedly "becoming discouraged with progress secondary to ongoing [range of motion] deficits." He nevertheless continued therapy and continued to make progress as evidenced by increased ROM. In September 2006, eleven months after the accident, Plaintiff's bone was "slowly healing" He was tender on palpation and "still had a delayed union." He was told by his surgeon to "slow down" on occupational therapy.

By January 2007, almost a year and a half after the accident, Plaintiff's metacarpals had healed, but Plaintiff still reported pain. He had a mild claw deformity and limited flexion. The surgeon opined that Plaintiff's "digital nerves or median nerve was caught on the initial injury." He had no positive Tinel's sign, but the doctor found repeat surgery with reconstruction would not be helpful. In a return to work capabilities form, the doctor again opined that further surgery would not improve the hand, Plaintiff was permanently injured, and had reached his maximum level of improvement. He instructed Plaintiff to discontinue physical therapy.

Although the ALJ noted Plaintiff's one surgery and physical therapy, he did not discuss the

second surgery or the continuous physical therapy for almost a year and a half. No doctor or therapist ever opined that Plaintiff was not making his best effort. In fact, Plaintiff was only released from therapy when the doctor opined he was permanently impaired and had reached his maximum improvement. In Plaintiff's case, his undisputed, severe work-related injuries lost him a job he had had for 22 years. That job paid $49,000.00 in the year before his accident and he had made $44,000.00 in just the eight months prior to his accident in August 2005. He testified he had been only two years away from receiving full retirement benefits. He was 50 years old at the time of the Administrative Hearing. The ALJ states it might be in the individual's "best interest" to pursue his workers' compensation claim. The undersigned goes so far as to opine it would have been foolish for Plaintiff to "abandon" his claim and continue to receive benefits and treatment in the hope of regaining his job.

What the ALJ has omitted from the paragraph is more important that what was included as pertains to this individual claimant. There is absolutely no evidence Plaintiff was malingering or attempting to get benefits he did not earn. There is absolutely no evidence he did not want to get back to his job or wanted to remain off work. All the evidence indicates he used his best effort at regaining the function in his dominant hand, and then learned to get by using it only as a brace or helper hand. The evidence shows Plaintiff suffered a terrible injury, and underwent a number of painful procedures and lengthy physical therapy, which, in the end, indisputably failed to get him to the point he could go back to the high-paying job he performed for 22 years. Even the State agency reviewing physicians found Plaintiff's complaints regarding his symptoms were credible.

The ALJ does not include pain as a residual effect of Plaintiff's injury. In his credibility analysis he "believes any residual pain symptoms that Plaintiff may have continued to experience

are <u>adequately relieved by medication</u> - - at least to such extent as would enable his ability to perform and sustain such a limited range of work activity as has been defined above."   As the ALJ noted, Plaintiff was taking five OxyContin pills per day.  The ALJ does not, however, provide any evidence to support a finding that Plaintiff's pain is "adequately relieved" by medication.  In February 2008, Plaintiff's treating physician, Dr. Currence, who prescribed his medications, still diagnosed Plaintiff with "chronic right hand pain."  The ALJ does not mention this diagnosis.  In fact, he does not discuss Dr. Currence, the treating physician, at all.

The ALJ did discuss Plaintiff's daily activities, noting that he daily or regularly enjoyed movies and television, played computer games, completed puzzles, helped care for his pet dogs, cut grass with a riding mower with assistance in getting it started, emptied a dishwasher, drove an automobile, shopped in stores and by computer, and ate out three to four times a week.  The pages cited by the ALJ in support of these activities do not show quite such a high level of functioning, however.  As to "help[ing] care for his pet dogs, Plaintiff stated only that he "fed them sometimes" (R. 134).  A friend bathed and walked the dogs, in addition to helping feed  them.  The reason Plaintiff "ate out three to four times a week" was because he could no longer cook as he used to because it was too hard to do with one hand.  He stated it was simply easier to eat out.  He emptied the dishwasher twice a week and it took him one hour to do so.  He could mow the grass with the riding mower if someone started it for him, but he had to rest a lot.  He shopped only once a month, for food and personal items, spending 15-20 minutes in the store or 1-3 hours on the computer.

The undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff's statements regarding his impairments and his ability to function are not entirely credible.

### D. Depression

Plaintiff next argues that there was sufficient evidence of Plaintiff's depression for the ALJ to at least explore whether he suffered from a mental impairment. Defendant contends the ALJ properly developed the record. The ALJ did not mention any mental impairments whatsoever.

42 U.S.C. § 421(h) provides:

> An initial determination under subsection (a), (c), (g), or (I) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner of Social Security has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

On Plaintiff's Function Report, completed April 2007, Plaintiff reported that he was having problems getting along with family, stating: "I have been told I am very short and angry with them." He reported problems with memory, completing tasks, concentration, and getting along with others. He said he could not remember simple things and could not concentrate. Where asked how he handled stress, Plaintiff replied: "Not good sence [sic] my accident I tend to go into a romm [sic] and put pillow over my head." Where asked how well he handled changes in routine, he answered: "With anger most of the time." His family said he was not himself–that he didn't smile or enjoy things anymore. He stated: "I fear that I am useless."

In June, 2007, State examining physician Dr. Beard noted that Plaintiff was prescribed and taking Lexapro, an antidepressant. On June 26, 2007, Plaintiff reported to his treating physician Dr. Currence that he experienced chronic right hand pain, hypertension, and depression (R. 664). Dr. Currence diagnosed depression, hypertension and chronic pain and added a prescription for Lexapro

(R. 665).[11] The undersigned finds there was evidence which indicated the existence of a mental impairment, yet there is no evidence the Commissioner of Social Security "made every reasonable effort to ensure that a qualified psychiatrist or psychologist [] completed the medical portion of the case review and any applicable residual functional capacity assessment."

On February 7, 2008, eight months later, Plaintiff reported to Dr. Currence that his depression had improved. Dr. Currence diagnosed depression improved, obesity, chronic hand pain and hypertension. When Plaintiff appeared at the Administrative Hearing, he was still taking an antidepressant, citalopram (generic for Celexa).

It is indisputable that Plaintiff had a diagnosed mental impairment. The diagnosis was made by his long-term treating physician. He was treated by his treating physician for that impairment for at least the two years prior to the ALJ's decision. The ALJ makes no mention of any mental impairment, however. This alone is reason to remand the case to the Commissioner for further proceedings. The undersigned finds substantial evidence does not support the ALJ's step two finding regarding Plaintiff's impairments. It follows that substantial evidence does not support his findings at steps three, four, and five, and his ultimate conclusion that Plaintiff was not disabled at any time relevant to his claim.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is not supported by substantial evidence. I accordingly recommend the

---

[11]Dr. Currence is Plaintiff's treating physician, with records of treatment dating back to 2000 (R. 656). Dr. Currence's diagnoses over those years also include: restless leg syndrome since 2000; back pain since 2000; heel pain in 2000; obesity since 2000; osteoarthritis and joint pain in 2001.

Defendant's Motion for Summary Judgment be **DENIED** and the Plaintiff's Motion for Summary Judgment be **GRANTED** by a **REMAND** of this matter to the Commissioner for further action in accordance with this Report and Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _22_ day of June, 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE